IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 16-cv-01788-PAB-KLM

TBL COLLECTIBLES, INC., d/b/a Colorado Coins, Cards & Comics,

   Plaintiff,

v.

OWNERS INSURANCE COMPANY,

   Defendant.
_____

**ORDER**
_____

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment on Its First Claim for Declaratory Relief [Docket No. 62], Defendant Owners Insurance Company's Motion for Summary Judgment [Docket No. 63], Plaintiff's Motion to Exclude Certain Opinions and Testimony of Defendant's Expert, John P. Craver, Esq. [Docket No. 54], and Owners' Motion to Exclude Certain Opinions and Testimony of Plaintiff's Expert David Young [Docket No. 83].  This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**I.  BACKGROUND[1]**

This case involves a dispute between the parties regarding payment of an insurance claim for stolen coins.  Plaintiff TBL Collectibles, Inc. owns and operates Colorado Coins, Cards & Comics, a retail coin and collectibles store in Arvada, Colorado.  Docket No. 62 at 2, ¶ 1; Docket No. 63 at 3, ¶ 2.  At all times relevant to this

_____

[1]The following facts are undisputed unless noted otherwise.

action, plaintiff held an insurance policy with defendant Owners Insurance Company, that provided commercial property insurance coverage.  Docket No. 63 at 3, ¶ 1.  On August, 30, 2015, plaintiff's store was burglarized after hours.  Docket No. 62 at 3, ¶ 4.  The only items stolen were a floor safe and its contents.  *Id.* at 3, ¶ 6.  Plaintiff alleges that the safe contained $31,800 in cash and $81,317 in bullion coins.  *Id.*[2]

Plaintiff reported the loss to the Arvada Police Department ("APD") on August 30, 2015.  Docket No. 62-19 at 7.  As part of its investigation into the incident, the APD prepared an Incident/Investigation Report containing a list of the stolen items as reported by Bruce Wray, the co-owner and manager of the store.  Docket No. 1 at 3, ¶ 11; Docket No. 62-18 (APD Report); Docket No. 62-19 (APD Report continued); Docket No. 75 at 3 (stating that the "APD generated an Incident and Investigation Report ('APD Report'), which also lists the coins Mr. Wray asserts were taken during the burglary"); Docket No. 62 at 3, ¶ 2 (stating that store is managed by owner of TBL, Bruce Wray).  On August 31, 2015, plaintiff informed defendant of the loss and submitted a claim under the insurance policy.  Docket No. 62 at 3, ¶ 5.  Defendant immediately assigned the claim to an adjuster, Jayme Larson.  Docket No. 63 at 5, ¶ 9.  Ms. Larson contacted Mr. Wray on September 1, 2015.  *Id.*  On September 2, 2015, Ms. Larson visited the store, where she "confirmed placement of the safe that was stolen by left over marks on the carpet."  Docket No. 1 at 6, ¶ 17; Docket No. 12 at 5, ¶ 17; Docket No. 67-11 at 20 (September 8, 2015 claims note).

---

[2]Plaintiff appears to define "bullion coins" as coins that do not have a face value and are not in current circulation.  The value of these coins is based on the value of the gold or silver from which they are made.  *Id.* at 6, ¶ 19.

At defendant's request, plaintiff provided the following documentation to substantiate the loss: (1) a handwritten list of the stolen items, which included the description and cost of each coin; (2) the APD Report; (3) invoices and deposit slips from Cornerstone Bullion, from which plaintiff had purchased coins prior to the theft; and (4) check copies, cash receipts, and bank statements reflecting plaintiff's coin purchases in the four years prior to the theft. *See* Docket No. 62 at 6, ¶¶ 17-18; Docket No. 67 at 8-9, ¶¶ 1, 5; Docket No. 62-24 at 6, 23:18-25 (discussing Cornerstone Bullion invoices and deposit slips); 62-25 (handwritten list of stolen items); Docket No. 62-26 at 2 (discussing invoices for coin purchases from Cornerstone Bullion); Docket No. 62-32 at 2 (discussing check copies and bank statements); Docket No. 67-2 at 3, 47:21-25 (noting that plaintiff purchased certain coins from Cornerstone Bullion); Docket No. 67-4 (APD Report).

On November 6, 2015, defendant authorized a policy limit payment of $15,000 for the stolen cash. Docket No. 1 at 7, ¶ 22; Docket No. 67-11 at 11. According to defendant, the Cornerstone Bullion invoices confirmed the existence of the cash in the safe. Docket No. 63 at 5, ¶¶ 9-10; Docket No. 62-24 at 6, 23:14-24:8.[3]

Ms. Larson continued her investigation of the stolen coins. *See* Docket No. 63-13 at 1; Docket No. 67-11 at 11. After discussions with the Home Office claims department, Ms. Larson ultimately concluded that the coins would be considered business personal property under the terms of plaintiff's insurance policy. *See* Docket

_____

[3]Plaintiff contends that the invoices from Cornerstone Bullion could not have proven that plaintiff had $31,800 in the safe at the time of the burglary. Docket No. 68 at 2, ¶ 5.

No. 63-13 at 1; Docket No. 67-11 at 9-10.[4]  She determined, however, that the documentation provided did not adequately substantiate plaintiff's loss.  Docket No. 62-29 at 2; Docket No. 63-13 at 2-3; Docket No. 67-11 at 5-7.  Ms. Larson assigned a forensic accounting firm – RGL Forensics – to inspect plaintiff's business records. Docket No. 63-13 at 2.  The accountant who reviewed the records, Paul DeBoer, determined that, although the records demonstrated a pattern of coin purchases, they did not prove the ownership or existence of the specific coins allegedly kept in the safe. Docket No. 63 at 6, ¶ 15; Docket No. 68 at 5-6, ¶ 15; Docket No. 62-32 at 2; Docket No. 67-11 at 3 (2/1/16 claims note).[5]  Mr. Wray was unable to provide further documentation because he did not keep written records of the coins he bought and sold.  Docket No. 63 at 4-5, ¶ 8; Docket No. 68-5 at 9, 12.  In addition, plaintiff admitted that many of the stolen items were purchased with cash and it did not have receipts.  Docket No. 68-5 at 12-14.

On March 16, 2016, defendant sent plaintiff a letter denying its claim for the stolen coins.  Docket No. 63-13.[6]  The letter states: "The documentation you have

---

[4]Defendant disagrees with plaintiff's assertion that the stolen coins were "covered" under the policy.  Docket No. 67 at 3, ¶ 4.  However, there appears to be no dispute that the coins would have been covered under the policy had plaintiff provided the type of documentation defendant claims was necessary.  *See* Docket No. 62-28 at 2; Docket No. 63-13 at 1-2.

[5]As plaintiff acknowledged in its interrogatory responses, the invoices for plaintiff's check purchases reflected only bulk purchases, not the purchase of individual coins.  Docket No. 68-5 at 8.

[6]Although the letter indicates that plaintiff could submit further documentation for defendant's review, Ms. Larson confirmed in her deposition that the letter constituted a denial of defendant's claim.  *See* Docket No. 54-4 at 13, 135:10-13.

4

provided has show a pattern of purchasing coins, however it has not substantiated the specific coins you are claiming." *Id.* at 2. The letter then quotes from the "Duties In the Event of Loss or Damage" provision of plaintiff's insurance policy and explains that, based on the policy language, plaintiff has "a duty to provide complete inventories of damaged and undamaged property" and to "prove the loss." *Id.* at 3. Citing plaintiff's failure to comply with that duty, the letter states that defendant is "unable to issue any further payments on [plaintiff's] claim." *Id.*

The March 16, 2016 letter does not reference fraud as a basis for defendant's denial of payment. *See id.* Moreover, Ms. Larson's claims notes indicate that she found Mr. Wray believable and perceived his continued purchasing activities after the loss to be "an indication that the loss [was] legitamite [sic]." Docket No. 67-11 at 4 (2/1/16 claims notes entry). Both Ms. Larson and Donald Gibson, a representative in the Home Office claims department, *see* Docket No. 62-24 at 7, 28:4-6; Docket No. 62-32, testified that they never determined Mr. Wray's claim was false or fraudulent. Docket No. 62-24 at 6-7, 24:14-25:4; Docket No. 77-4 at 3, 15:6-13.

Plaintiff filed this lawsuit on July 13, 2016, asserting three claims for relief: (1) declaratory judgment as to whether plaintiff fulfilled its post-loss obligations under the insurance policy; (2) breach of contract; and (3) unreasonable delay or denial of benefits under Colo. Rev. Stat. § 10-3-1115. Docket No. 1. On July 5, 2017, plaintiff moved for partial summary judgment on its first claim for a declaratory judgment. Docket No. 62. On July 6, 2017, defendant moved for summary judgment on all claims. Docket No. 63. Both parties have also filed motions to exclude certain expert opinions

under Fed. R. Evid. 702.  *See* Docket No. 54 (plaintiff's motion to exclude opinions of

John Craver); Docket No. 83 (defendant's motion to exclude opinions of David Young).

## II.  MOTIONS TO EXCLUDE

The Court will begin by addressing the parties' motions to exclude certain

opinions of expert witnesses given that the outcome of those motions may affect the

Court's resolution of the pending summary judgment motions.

### A.  Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence

702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue; (b) the testimony is based on sufficient facts or data; (c) the
> testimony is the product of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods to the facts of the
> case.

Fed. R. Evid. 702.  As the rule makes clear, while required, it is not sufficient that an

expert be qualified based upon knowledge, skill, experience, training, or education to

give opinions in a particular subject area.  Instead, the Court must "perform[] a two-step

analysis."  *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).

After determining whether the expert is qualified, the Court must assess whether the

specific proffered opinions are reliable.  *See id.*; Fed. R. Evid. 702 (requiring that the

testimony be "based on sufficient facts or data," be the "product of reliable principles

and methods," and reflect a reliable application of "the principles and methods to the

facts of the case").

Rule 702 thus imposes on the district court a "gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  To perform this role, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). The Supreme Court in *Daubert* identified four non-exclusive factors a court may consider in assessing reliability; however, those factors are not applicable in every case.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 150-53 (1999).  Indeed, the trial court has "the same kind of latitude in deciding *how* to test an expert's reliability . . . as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Id.* at 152.  Regardless of the specific factors applied, the objective of *Daubert*'s gatekeeping requirement is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.*

Although the proponent of the challenged testimony has the burden of establishing admissibility, *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001)), the reliability standard does not require proof "that the opinion is objectively correct, but only that the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data

as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008) (internal citation omitted).

Assuming the standard for reliability is met, the Court must also ensure that the proffered testimony will assist the trier of fact. *See Kumho Tire*, 526 U.S. at 156; *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006). "Relevant expert testimony must logically advance[ ] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (internal quotation marks and citations omitted). In assessing whether expert testimony will assist the trier of fact, the Court should also consider "whether the testimony 'is within the juror's common knowledge and experience, and 'whether it will usurp the juror's role of evaluating a witness's credibility.'" *Id.* at 476-77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

### B. Analysis

#### 1. Plaintiff's Motion to Exclude Testimony of John Craver

Defendant has designated John P. Craver, an attorney who practices in the field of insurance law, as an expert witness. Docket No. 54-1 at 3, 6. In his expert report, Mr. Craver concludes that defendant had a "reasonable basis to deny portions of [plaintiff's] claim based on the evidence they had in their claim file at the time of the denial." *Id.* at 10. Plaintiff does not challenge Mr. Craver's qualifications as an expert witness. *See* Docket No. 61 at 1. Instead, plaintiff seeks to exclude a number of his statements and opinions on grounds that: (1) they are irrelevant, (2) they improperly

usurp the function of the trial judge, (3) they are conclusory, and (3) they are factually erroneous.  *See generally* Docket No. 54; Docket No. 61.

### a.  Relevance

Plaintiff argues that the following opinions and statements expressed in Mr. Craver's expert report are irrelevant and that the Court should order that Mr. Craver not state them at trial: (1) Mr. Craver's references to Colo. Rev. Stat. § 13-17-101; (2) Mr. Craver's references to Colorado Division of Insurance Regulation 5-1-14; (3) Mr. Craver's opinions regarding defendant's prompt handling of plaintiff's claim; and (4) Mr. Craver's opinions regarding insurance fraud.  *See* Docket No. 54 at 8-12.

Plaintiff first argues that Mr. Craver's references to Colo. Rev. Stat. § 13-17-101 are irrelevant and misleading because plaintiff may prevail on its bad faith claim under § 10-3-1115 merely by showing that defendant acted unreasonably in denying plaintiff's claim for insurance benefits.  *See* Docket No. 54 at 9; Docket No. 61 at 4.  Section 13-17-101 is a legislative declaration explaining that the general assembly has "set[ ] forth provisions for the recovery of attorney fees . . . when the bringing or defense of an action . . . is determined to have been substantially frivolous, substantially groundless, or substantially vexatious."  In his expert report, Mr. Craver states that "[t]he absence of a reasonable basis [standard under § 10-3-1115] . . . . is quite similar to the proof required for attorney's fees awards under C.R.S. § 13-17-101"; under the latter provision, "fees are awarded if the claim is frivolous, groundless or lacking a rational basis."  Docket No. 54-1 at 7.  Defendant argues that these statements are admissible because they were only meant to illustrate that the "absence of a reasonable basis"

standard under § 10-3-1115 is not a novel legal concept.  Defendant also disavows any

implication that plaintiff faces a higher burden under § 13-17-101.  Defendant's

arguments do not rebut plaintiff's contention that the statute is irrelevant to any issue in

this case.  Moreover, Mr. Craver's point that the absence of a reasonable basis is not a

novel legal concept is neither relevant to the issues in this case nor likely to assist a jury

in its resolution of the parties' factual disputes.  Mr. Craver's statements and opinions

regarding § 13-17-101 are therefore excluded as irrelevant.  *See United States v.*

*Sparks*, 8 F. App'x 906, 912 (10th Cir. 2001) (unpublished) ("The district court has been

charged by the Supreme Court with the responsibility of acting as a gatekeeper to

exclude unreliable and irrelevant expert testimony.") (citing *Daubert*, 509 U.S. at 597);

*A-W Land Co., LLC v. Anadarko E&P Co. LP*, No. 09-cv-02293-MSK-MJW, 2017 WL

4161278, at *9 (D. Colo. Sept. 20, 2017) (excluding expert testimony as irrelevant under

Fed. R. Evid. 702(a) and 401).

Plaintiff next challenges Mr. Craver's references to Colo. Code Regs. § 702-5:5-

1-14 ("Regulation 5-1-14").  That regulation prescribes certain penalties for an insurer's

failure to make timely decisions and/or payment on first-party claims.  *See* Colo. Code

Regs. § 702-5:5-1-14(4)(A)(1).  Specifically, the statute imposes a monetary fine if an

insurer "fails to make a decision and/or pay benefits due under the policy within sixty

(60) days after a valid and complete claim has been received, and there is not a

reasonable dispute between the parties."  § 702-5:5-1-14(4)(A)(1)(b).  A "valid and

complete claim" has been "received" by an insurer when

> (1) All information and documents necessary to prove the insured's claim
> have been received by the insurer; . . . 3) The terms and conditions of the
> policy have been complied with by the insured; . . . (5) There are no

indicators on the claim requiring additional investigation before a decision can be made; and/or . . . (7) Negotiations or appraisals to determine the value of the claim have been completed; and/or (8) Any litigation on the claim has been finally and fully adjudicated.

§ 702-5:5-1-14(4)(A)(2)(a). The statute further provides that a "reasonable dispute" may exist when: (1) information necessary for a determination on the claim has not been submitted; (2) conflicting information has been submitted and additional investigation is needed; (3) the insured has failed to comply with the terms of the insurance policy; or (4) litigation has commenced regarding the claim. § 702-5:5-1-14(4)(A)(2)(b).[7]

In his expert report, Mr. Craver states that: (1) the regulation "provides guidance to insurers on when the [sic] have a duty to pay first party claims" in Colorado, Docket No. 54-1 at 9; (2) "[in] reviewing these . . . regulations, it does not appear that there is a valid and complete claim that Owners Insurance owes at this time, "*id.*; (3) the regulation "would indicate that Owners Insurance had a reasonable basis for not paying" plaintiff's claim, *id.*; and (4) defendant's handling of the claim complied with the regulation. *Id.* at 10.

Defendant contends that Mr. Craver's discussion of the regulation "provides context for the parameters of insurance claims handling." Docket No. 60 at 5. In response, plaintiff claims that at least two cases have specifically held that Regulation 5-1-14 is irrelevant in bad faith actions brought pursuant to Colo. Rev. Stat. § 10-3-1115. *See* Docket No. 54 at 9-10; Docket No. 61 at 5. The cases plaintiff cites do not

---

[7]The regulation lists two additional circumstances potentially constituting a "reasonable basis," but Mr. Craver does not cite or appear to rely on those circumstances in his report.

support this proposition.

In *Fisher v. State Farm Mutual Automobile Insurance Co.*, 2015 WL 2198515 (Colo. App. 2015), the Colorado Court of Appeals held that Regulation 5-1-14 did not support the insurer's argument that "it is not unreasonable, as a matter of law, to deny or delay payment on anything less than an entire [underinsured motorist] claim." *Id.* at *5. In reaching that conclusion, the court reasoned that "the regulation and its authorizing statute simply have no application to the civil action established by section 10-3-1115. Rather, the regulation applies to administrative penalties assessed by the Commissioner of Insurance pursuant to the Commissioner's statutory authority to regulate the insurance industry." *Id.* at *6. The court further stated that, "although administrative regulations 'may be used as valid . . . evidence of industry standards,' when a statute defines a standard of reasonableness, as it does here, an administrative regulation may not modify or contradict that standard." *Id.* At first glance, these statements seem to support plaintiff's contention that Mr. Craver's references to Regulation 5-1-14 are irrelevant in this case. When read in context, however, it is clear that the statements were made in conjunction with the *Fisher* court's determination that the regulation's reference to a "valid and complete claim" does not preclude an insured from asserting a bad faith claim based on the unreasonable delay or denial of only a portion of his claim for benefits. *See id.* at *6 (stating issue as "whether an insured's demand for payment on one component of a UIM claim is sufficient in and of itself such that an insurer has an obligation to not unreasonably delay or deny paying benefits for it under section 10-3-1115); *see also id.* ("[T]he plain language of section 10-3-1115 does

12

not preclude a determination that an insurer unreasonably denied or delayed payment of *part of an insured's UIM claim*. Thus, even if the regulation addressed this issue, it could not modify or contradict the plain language of the statute." (emphasis added)). *Fisher* thus does not stand for the proposition that the regulation is never relevant to the reasonableness inquiry under § 10-3-1115.

Plaintiff's citation to *Etherton v. Owners Insurance Co.*, 829 F.3d 1209 (10th Cir. 2016), is similarly unavailing. There, the court stated that an insurer does not necessarily act "reasonably if it meets the regulation's minimum standards." *Etherton*, 829 F.3d at 1228 n.7. But even if compliance with the regulation is not conclusive of liability under § 10-3-1115, it may still be relevant. *See Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343-44 (Colo. 2004) ("[W]here the legislative enactment or administrative rule is not conclusive of the standard of care, the statute or rule may be used as evidence of the standard of care from which the trier of fact may evaluate the defendant's conduct."). The court in *Etherton* recognized as much when it stated that "regulations . . . provide minimum standards," and "an insurer may act unreasonably it if violates the regulation." *Etherton*, 829 F.3d at 1228 n.7. Consistent with other decisions in this district, the Court finds that defendant's references to the Department of Insurance regulations are relevant to plaintiff's statutory bad faith claim. *See Stamey v. Nat'l Gen. Ins. Co.*, No. 15-cv-0560-WJM-MJW, 2016 WL 8540310, at * (D. Colo. Sept. 22, 2016) (stating that Regulation 5-1-14 "provides evidence of what is reasonable, but is not conclusive of the statutory standard of reasonableness under § 10-3-1115"); *Spendrup v. Am. Family Mut. Ins. Co.*, No. 13-cv-00513-KLM, 2014 WL

321155, at *4 (D. Colo. Jan. 29, 2014) (finding that Regulation 5-1-14 provided evidence that "genuine disagreement" as to amount of compensable damages existed, such that defendant's failure to advance payment of insurance claim did not constitute an unreasonable denial of benefits under § 10-3-1115).[8]

Plaintiff also challenges the relevance of Mr. Craver's opinions on the timeliness of defendant's claims handling. Docket No. 54 at 10. Mr. Craver states in his report that (1) "there were no substantial delays in the adjustment" of plaintiff's claim, Docket No. 54-1 at 9; (2) defendant's investigation of the claim was "prompt and proactive," *id.*; and (3) the policy benefits determined to be owed have been paid in a timely manner. *Id.* at 10. Plaintiff contends that these opinions are irrelevant because its bad faith claim is predicated on defendant's unreasonable denial of benefits, not its failure to conduct an adequate or timely investigation. Docket No. 54 at 10.[9] Defendant

---

[8]As discussed in more detail below, plaintiff's statutory bad faith claim is not predicated on defendant's delay in authorizing payment. Accordingly, the regulation is only relevant insofar as it defines "complete and valid claim" and "reasonable dispute," given that such definitions bear on whether plaintiff's claim was "fairly debatable" and, relatedly, whether defendant's nonpayment was reasonable under the circumstances. *See Glacier Constr. Co. v. Travelers Property Cas. Co. of Am.*, 569 F. App'x 582, 589 n.4 (10th Cir. 2014) (unpublished) (citing portion of regulation "identifying relevant reasonable disputes" and stating that, because "[t]he regulation directs the insurer to act reasonably," court's conclusion on statutory bad faith claim also applied to regulation); *Baker v. Allied Prop. & Cas. Ins. Co.*, 939 F. Supp. 2d 1091, 1107 (D. Colo. 2013) ("The fact that an insurer's reason for denying or delaying payment of a claim was 'fairly debatable' weighs against finding that the insurer acted unreasonably.").

[9]Plaintiff's complaint asserts a violation of Colo. Rev. Stat. § 10-3-1115 based on defendant's "delay in payment of benefits owed and/or denial of TBL's personal property claim." Docket No. 1 at 13. In its response to defendant's motion to exclude, however, plaintiff explains that, at the time it filed the complaint, it was unclear whether defendant had denied plaintiff's claim for benefits. Docket No. 54 at 10. Thus, plaintiff "styled" its bad faith claim "inclusively." *Id.* Ms. Larson has since clarified that defendant denied plaintiff's claim on March 16, 2016. *Id.*; Docket No. 54-4 at 13,

responds that the opinions regarding defendant's prompt claims handling "support[] the position that Owners' basis for denying the safe claim was justified, because it illustrates Owners' claim handling practices with regard to related portions of the claim." Docket No. 60 at 6. The Court is not persuaded by this asserted connection. The fact that defendant timely investigated plaintiff's claim and awarded benefits on a portion of the loss does not make it any more likely that defendant had a reasonable basis for denying payment for the stolen coins. Accordingly, Mr. Craver's opinions regarding the timeliness of defendant's claims handling are irrelevant to plaintiff's bad faith claim and will be excluded.

Plaintiff lastly requests that the Court exclude Mr. Craver's opinions regarding fraudulent insurance claims and Special Investigation Unit ("SIU") investigations. Docket No. 54 at 11-12. In his report, Mr. Craver states:

> It should also be noted that the Colorado legislature, through C.R.S. § 10-1-128, makes it clear that there is a strong public policy within the state wherein the state is critically interested in investigating and stopping insurance fraud. The General Assembly has stated that insurance fraud is expensive and that it increases premiums and places businesses at risk. Insurance fraud reduces the customer's ability to raise their standard of living and decreases the economic vitality of the state. I am not suggesting here that Owners Insurance has alleged its insured is committing insurance fraud. I think it is simply important for a jury to know that a critical investigation into theft claims and the amount of the damages sustained, including the use of SIU departments to investigate background, credit and financial issues, is clearly authorized and in fact encouraged by the state's statutes and regulations. There was nothing

---

135:10-13. Plaintiff argues that its bad faith claim has never been predicated on the assertion that defendant failed to timely investigate plaintiff's claim for benefits. Docket No. 54 at 10. Upon review of the summary judgment briefing, the Court agrees that is not plaintiff's theory in this case. *See* Docket No. 68 at 18 ("For its Third Claim for Relief, TBL alleges that Owners violated C.R.S. § 10-3-1115 because it has denied TBL's claim for commercial property benefits without a reasonable basis.").

unusual in an insurer conducting an SIU investigation in a claim of this nature.

Docket No. 54-1 at 9. Plaintiff contends that these opinions are irrelevant and prejudicial because there is no evidence that defendant suspected Mr. Wray of reporting a false or fraudulent claim. Docket No. 54 at 11. The Court agrees. Although plaintiff's claim was initially referred to the SIU for investigation, *see* Docket No. 60-4 at 2-5, 34:1-35:23, 40:1-41:1, there is no evidence that anyone at Owners suspected Mr. Wray of lying about the stolen coins. *See* Docket No. 62-24 at 6-7, 24:14-25:4; Docket No. 67-11 at 4 (2/1/16 claim note); Docket No. 77-4 at 3, 15:6-13. The sole reason defendant gave for denying plaintiff's claim was that plaintiff had failed to provide adequate documentation of the stolen coins. *See* Docket No. 63-13. Any statements or opinions regarding insurance fraud and SIU investigations will therefore be excluded as irrelevant.[10]

### b. Statements Regarding Applicable Law

Plaintiff identifies nineteen statements in Mr. Craver's expert report which allegedly constitute impermissible statements of law. *See* Docket No. 54 at 6-7. These

---

[10]Colorado courts have held that an insurer waives the right to assert a particular defense to liability where it did not deny the insured's claim on that basis and only asserted the defense in subsequent litigation. *See, e.g.*, *Colard v. Am. Family Mut. Ins. Co.*, 709 P.2d 11, 15 (Colo. App. 1985); *see also Walker v. Am. Standard Ins. Co. of Wis.*, No. 11-cv-00927-LTB, 2011 WL 3876901, at *2 (D. Colo. Sept. 2, 2011) (noting that, under Colorado law, "an insurer waives its right to assert defenses in litigation that it did not raise when it denied liability on other grounds prior to litigation"). In this case, not only did defendant's denial letter cite inadequate documentation as the sole basis for defendant's decision to deny plaintiff's insurance claim, *see* Docket No. 63-13, but defendant continues to assert the same basis for the denial in its summary judgment briefing. Accordingly, defendant may not now use its expert witness to suggest that the denial of plaintiff's claim was reasonable in light of suspicions that plaintiff's claim was false or fraudulent.

statements appear to set forth the various legal standards Mr. Craver applied in reaching his conclusions.  According to defendant, the statements were meant to "provide context as to the legal parameters for insurance industry standards."  Docket No. 60 at 9-10.  The Court notes that statements eleven through thirteen and nineteen, as identified in plaintiff's motion, *see* Docket No. 54 at 7, have already been excluded as irrelevant.  However, the Court agrees with plaintiff that statements one through eight and fourteen and fifteen should also be excluded.

The Tenth Circuit has held that "a witness may refer to the law in expressing an opinion" or "aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms."  *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988).  However, witness testimony that aims to "direct the jury's understanding of the legal standards upon which [its] verdict must be based" improperly usurps the role of the trial judge and is therefore inadmissible.  *Id.* at 810.[11]  The Court finds that the first eight statements challenged by plaintiff fall within this prohibition.  These statements do nothing more than rephrase the legal standard under § 10-3-1115 and express Mr. Craver's beliefs as to the legal rights and obligations of the parties.  Although Mr. Craver may certainly *refer* to the law in stating his opinions, he may not "define the legal parameters within which the jury must exercise its fact-finding function."  *Id.* at 809-

---

[11]As the court in *Specht* explained, these concerns about a witness usurping the function of the trial judge are particularly pronounced where, as here, the expert witness is an attorney.  *See id.* at 808-09 ("There is a significant difference between an attorney who states his belief of what law should govern the case and any other expert witness.").  Not only is the jury more likely to be unduly influenced by an attorney-witness, but competing testimony on the applicable law would give rise to significant confusion.  *Id.* at 809.

810.[12]

Defendant argues that industry standards in Colorado are defined by state statute and case law and thus it is impossible for Mr. Craver to express any opinion that defendant complied with those standards without citing to the relevant legal authorities. Docket No. 60 at 10. But defendant's argument fails to distinguish between those statements of Mr. Craver that merely rephrase the determinative legal standard in this case – whether defendant acted reasonably in denying plaintiff's claim – and Mr. Craver's references to statutory and regulatory provisions that, though not conclusive of liability, may illustrate what constitutes "reasonable" conduct in the insurance industry. *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (holding that expert witness did not "usurp the court's role" where his references to California statutory provisions, which informed his understanding of insurance industry norms, were "ancillary to the ultimate issue of bad faith"). Pursuant to this distinction, the Court finds that statements sixteen through eighteen regarding Regulation 5-1-14 are admissible. In contrast to the other challenged statements, Mr. Craver's reference to the regulation is not an attempt to "define the legal parameters within which the jury must exercise its fact-finding function." *Specht*, 853 F.2d at 809-10. Mr. Craver merely seeks to identify certain regulatory standards that may bear on the reasonableness of defendant's conduct for purposes of § 10-3-1115.

In summary, the Court will permit testimony as to Regulation 5-1-14. All other

_____

[12]Moreover, as defendant points out, the decision of whether to admit expert testimony in bad faith insurance cases is "left to the sound discretion of the trial court." *Vining v. Enter. Fin. Grp.*, 148 F.3d 1206, 1218 (10th Cir. 1998).

statements identified by plaintiff, *see* Docket No. 54 at 6-7, will be excluded.[13]

### c. Conclusory Opinions

Plaintiff also argues that the following statements and opinions contained in the expert report are unsupported: (1) defendant's claim handling complied with industry practices, Docket No. 54-1 at 10; (2) defendant acted in compliance with the Unfair Claims Practices Act, *id.*; (3) defendant fully complied with the requirements of § 10-3-1104, *id.*; (4) defendant's denial of the claim cannot "fairly be considered willful," *id.*; (5) "businesses of this nature are required, by statute, to keep receipts and records of purchases of valuable commodities such as gold coins," *id.*; (6) "[b]usinesses are required for tax purposes to maintain an accurate inventory of the purchase date for items purchased, as well as the amount paid for the items purchased," *id.*; and (7) a "business is expected to have some proof of purchase or ownership of valuable

---

[13]The Court further notes that statements five, fourteen, and fifteen pertain to a legal standard that is not applicable in this case. Section 10-3-1113 of the Unfair Claims Practices Act codifies the common law tort of bad faith breach of an insurance contract and provides that "[u]nder a policy of first-party insurance, the determination of whether the insurer's delay or denial was reasonable shall be based on whether the insurer knew that its delay or denial was unreasonable or whether the insurer recklessly disregarded the fact that its delay or denial was unreasonable." Colo. Rev. Stat. § 10-3-1113(3); *see also Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 415 (Colo. 2004) (explaining, in context of common law bad faith claim, that there is no quasi-fiduciary duty with respect to first-party claims and that first-party claimant must therefore "prove that the insurer either knowingly or recklessly disregarded the validity of the insured's claim"). The heightened intent required for a common law bad faith claim does not, however, apply to claims of statutory bad faith under § 10-3-1115. *See* Colo. Rev. Stat. § 10-3-1115 (2) ("Notwithstanding section 10-3-1113(3), for the purposes of an action brought pursuant to this section and section 10-3-1116, an insurer's delay or denial was unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis . . . ."); *Wahlert v. Am. Standard Ins. Co of Wis.*, 173 F. Supp. 3d 1187, 1193 (D. Colo. 2016) (distinguishing between common law and statutory bad faith claims). Plaintiff has not brought a claim against defendant for common law bad faith under § 10-3-1113.

19

inventory of this nature for numerous legal reasons." *Id.*; *see also* Docket No. 54 at 12-13 (listing challenged opinions).  Defendant contends that these statements "are supported by [Mr. Craver's] review of all relevant documents" and that the "expert report specifically connects [Mr. Craver's] specialized knowledge to the facts at issue in this case."  Docket No. 60 at 14.  With the exception of the first statement challenged by plaintiff, the Court disagrees.

Fed. R. Evid. 702(b) requires that expert testimony be "based on sufficient facts or data."  Thus, a district court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Etherton*, 829 F.3d at 1218 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  Mr. Craver asserts that businesses are legally obligated to maintain records of purchased items.  His report, however, contains no reference to legal authorities supporting this conclusion.  While Mr. Craver may be correct, defendant bears the burden of establishing the admissibility of an expert's opinion and Mr. Craver's opinion is mere *ipse dixit*.  Accordingly, the Court finds that Mr. Craver's opinions regarding businesses' record-keeping obligations lack a sufficient basis to satisfy the requirements of Fed. R. Evid. 702.

The Court also agrees that Mr. Craver does not adequately support his opinions concerning defendant's compliance with the "Unfair Claims Practices Act."  Most notably, Mr. Craver does not specify the portions of the Act to which his second and fourth opinions pertain.[14]  If the opinions relate to § 10-3-1115, Mr. Craver's statement

---

[14]The relevant portion of Mr. Craver's expert report states as follows:

that defendant acted in compliance with the Act goes to the ultimate legal issue in this case. *See Specht*, 853 F.2d at 808 ("[T]estimony which articulates and applies the relevant law . . . circumvents the jury's decision-making function by telling it how to decide the case."). Although Mr. Craver may "testify about how the law applies to a certain set of facts," he may not offer opinions on ultimate issues without explaining how he reached his conclusions. *United States v. Richter*, 796 F.3d 1173, 1195-96 (10th Cir. 2015) ("[A]n expert may not simply tell the jury what result it should reach without providing any explanation of the criteria on which that opinion is based or any means by which the jury can exercise independent judgment."). To the extent that Mr. Craver is relying instead on § 10-3-1113, his opinion is both unreliable and irrelevant. *See Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 756 (Colo. App. 2012) (recognizing that "the standard contained in § 1115 arguably is less onerous on the insured" than the standard for common law bad faith claims under § 10-3-1113 (internal quotations and

---

The insurer acted in compliance with the Unfair Claims Practices Act. There is no suggestion here of a general business practice. Its denial cannot fairly be considered willful. It investigated coverage promptly. The adjuster proactively looked for coverage to assist the insured. The policy benefits that have been determined owed have been paid in a timely manner. The payment for repairs and the cash loss was prompt. The insurer has given a reasonable explanation for its claims actions and its decision not to pay for the reported stolen collector coins. It has not attempted to settle the claim for less than the amount a reasonable person would. It appears Owners Insurance has fully complied with the requirements of the Unfair Claims Practices Act set forth at C.R.S. § 10-3-1104.

Docket No. 54-1 at 10.

brackets omitted)).[15]  Mr. Craver's first, second, and fourth statements, identified above,
are therefore excluded to the extent that they rely on § 10-3-1113 or express an
unsupported opinion as to the reasonableness of defendant's actions under § 10-3-
1115.

The Court reaches a different conclusion, however, insofar as Mr. Craver opines
as to defendant's compliance with Colo. Rev. Stat. § 10-3-1104 and "industry
practices."  As this Court has previously recognized, conduct of the kind set forth in
§ 10-3-1104 is "relevant to determining whether an insurer's delay or denial was
reasonable" for purposes of a statutory bad faith claim because "§ 10-3-1115 disclaims
only the intent requirement, and not the definition of reasonableness, under a common
law claim."  *Etherton v. Owners Ins. Co.*, No. 10-cv-00892-PAB-KLM, 2013 WL 68702,
at *5 (D. Colo. Jan. 7, 2013) (internal quotation marks omitted).  Although Mr. Craver's
explanation for these conclusions is thin, he references particular requirements of § 10-
3-1104, *see, e.g.*, Docket No. 54-1 at 9 ("The statute also provides insurers should
consider all available information in making claims decisions."), and identifies specific
actions by defendant that purportedly complied with those requirements.  *See id.* at 10
(stating that defendant "investigated coverage promptly" and "proactively looked for
coverage to assist the insured").  As to the claim that defendant complied with "industry
practices," the Court agrees that Mr. Craver should have clarified the particular
practices to which he refers.  Nevertheless, he does address defendant's compliance

---

[15]Likewise, Mr. Craver's opinion that the denial of plaintiff's claim "cannot fairly be
considered willful" is irrelevant to whether defendant acted reasonably under § 10-3-
1115.  *See* Docket No. 54-1 at 10.  Statutory bad faith claims contain no requirement of
willful conduct and thus any testimony to that effect would only confuse the jury.

with § 10-3-1104 and Regulation 5-1-14, both of which provide some evidence of applicable "industry standards." The Court therefore declines to exercise its gatekeeping role to exclude Mr. Craver's opinions on defendant's compliance with (1) § 10-3-1104 and (2) Regulation 5-1-14.[16]

### d. Erroneous Statements of Fact

Plaintiff contends that Mr. Craver's expert report contains the following erroneous factual statements: (1) plaintiff submitted no documentary or independent proof of ownership; (2) the only evidence submitted supporting ownership is the statement of the insured that he owned his property; (3) the insured's lack of proof supports an inference that he did not own or purchase the coins; (4) there is no regulation, statute, or formula to determine the adequacy of proof of ownership to substantiate a loss; and (5) an insurer does not act unreasonably in seeking resolution through the courts. Docket No. 54 at 14. Defendant argues that these facts are simply Mr. Craver's "observations" based on the evidence he reviewed. Docket No. 60 at 12.

To the extent these statements constitute mere factual assertions based on the evidence reviewed, the Court finds that Fed. R. Evid. 702 is an inappropriate vehicle for challenging them. Although the accuracy of the facts and assumptions underlying an expert opinion may impact the reliability of that opinion, *see Crabbe*, 556 F. Supp. 2d at 1224, the accuracy of the facts themselves is an issue more appropriately reserved for trial. *See id.* ("The accuracy of the assumption is an issue for trial because it affects the

_____

[16]Mr. Craver may not opine as to defendant's compliance with "industry practices" generally. His testimony on defendant's compliance with industry standards will therefore be limited to those opinions pertaining to § 10-3-1104 and Regulation 5-1-14, which were identified in his expert report.

weight of the opinion."); *see also United States v. Crabbe*, No. 06-CR-00294-MSK, 2007 WL 1704138, at *2 (D. Colo. June 11, 2007) ("The 702 Hearing is not intended to address the weight or persuasiveness of a proffered opinion, nor the accuracy or assumptions upon which an opinion is based. These issues are more appropriately addressed at trial."). Contrary to plaintiff's assertion, however, statements three through five appear to be statements of opinion, not fact. Nevertheless, the Court agrees with plaintiff that statements three and five are both unsupported and irrelevant. As previously noted, there is no evidence that defendant suspected plaintiff's claim as being false or fraudulent. And defendant did not "seek[] resolution through the courts" – it was plaintiff that initiated this lawsuit.[17] Because these opinions lack a basis in fact and are irrelevant to the issues in this case, they will be excluded. Mr. Craver will, however, be permitted to opine on the absence of standards governing the adequacy of documentation proving a loss, as this opinion is relevant to the reasonableness of defendant's conduct.

### 2. Defendant's Motion to Exclude Testimony of David Young

Plaintiff has designated David Eugene Young, a certified professional public adjuster, as an expert witness. Docket No. 83-1 at 1. Mr. Young opines that Mr. Wray

---

[17]Moreover, to the extent Mr. Craver is suggesting that an insured cannot prevail on a statutory bad faith claim prior to a judicial determination of coverage and/or benefits owed, courts in this district have rejected similar arguments. *See, e.g.*, *Baumann v. Am. Family Mut. Ins. Co.*, No. 11-cv-00789-CMA-BNB, 2012 WL 122850, at *5 (D. Colo. Jan. 17, 2012) (finding similar argument untenable, given that "any insurer would be insulated from liability under § 10-3-1115(a) as long as they dispute[d] the amount of 'benefits owed,' no matter how unreasonable the insurer's position"); *see also Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, 827 F.3d 1256, 1261-62 (10th Cir. 2016) (under Colorado law, fact that insurance claim is "fairly debatable" does not preclude finding that insurer acted unreasonably in denying payment).

complied with his obligations under the terms of the insurance policy and that defendant's denial of insurance benefits was unreasonable. Docket No. 83-1 at 8-9; Docket No. 84 at 3. In particular, his report concludes that: "[t]he Home Office blocked [Jayme Larson] from paying [plaintiff's claim] and forced her to throw every possible argument not to do so to the insured"; Owners made up requirements not found in the insurance policy; Owners "has attempted to create a level of ownership proof that the insured cannot meet when in fact, the insured HAS complied with the Duties After Loss provision of his policy"; Owners has failed to effectuate a prompt, fair, and equitable settlement of claims "even though liability has become 'reasonably' clear"; and "Bruce Wray . . . has complied with the terms of his policy and is therefore entitled to payment." Docket No. 83-2 at 5-6.

Defendant moves to exclude certain of Mr. Young's opinions on grounds that Mr. Young is generally unqualified to opine on the matters addressed in his report, *see* Docket No. 83 at 9-11, and that his opinions are: (1) based on an unreliable methodology, *see id.* at 5-8, 13-15; (2) based on insufficient facts or data, *see id.* at 11-15; (3) irrelevant, *see id.* at 8-9; and (4) unhelpful to the trier of fact. *See id.* at 11.

### a. Qualifications

Defendant argues that Mr. Young is unqualified to opine as to whether defendant's handling of plaintiff's claim was reasonable because he has never worked as an accountant, attorney, or adjuster for an insurance company. Docket No. 83 at 10. According to defendant, this places Mr. Young "on the outside looking in, with no clear view of either the applicable Colorado industry standards or whether they were met in

this particular case." *Id.*

Plaintiff responds by citing Mr. Young's qualifications. Mr. Young has his own insurance adjusting firm and is licensed to provide public adjusting services in several states, including Colorado. *See* Docket No. 83-1 at 12; Docket No. 84-2 at 12, 58:18-20, 60:2-3.[18] For the past twenty-five years, he has also owned and operated the Adjusters Insurance School, located in Mesa, Arizona, which offers a one-year training program for in-house insurance adjusters. *See* Docket No. 84 at 4; Docket No. 84-2 at 8, 38:21-39:19. Mr. Young is further approved as an Instructor in Insurance Topics in Colorado and has contributed to portions of the Insurance Settlement Handbook addressing the appraisal of insurance claims. *See* Docket No. 83-1 at 14; Docket No. 84-2 at 12, 60:10-16. To maintain his credentials, Mr. Young has completed continuing education training on state-specific laws governing the insurance industry. *Id.* at 13, 65:5-15.

In light of this experience, the Court finds that Mr. Young is sufficiently qualified to offer the opinions challenged by defendant. Defendant maintains that Mr. Young has no experience with industry-side claims handling. *See* Docket No. 83 at 10; Docket No. 85 at 3. But defendant does not cite any authority for the proposition that a public adjuster is unqualified to opine on an insurance company's handling of an claim merely because he serves as an advocate for the insured. *Cf. Williamson v. Metropolitan Property & Cas. Ins. Co.*, 2017 WL 4355975, at *5 (D.N.M. Sept. 28, 2017) (finding that

---

[18]Mr. Young testified that in his time with Brown O'Haver, his insurance adjusting firm, he has adjusted approximately three hundred theft claims, twenty percent of which involved commercial theft. Docket No. 84-2 at 10, 49:3-15.

experience representing insureds in New Mexico rendered attorney "qualified as an expert in the customs and practices of the insurance industry" in the state); *Southerland v. Argonaut Ins. Co.*, 794 P.2d 1102, 1106 (Colo. App. 1990) ("We reject the notion that only present or former employees of the insurance industry are qualified to render expert opinions about its operations.").  The "chief distinction" between staff/independent adjusters and public adjusters is that "public adjusters directly represent the claimant during the claims process and take a percentage of the settlement for their services."  Steven Plitt & Ryan Sandstrom, *Evaluating the Relationship Between Independent Insurance Adjusters and Insureds: The Case Against Imposing an Independent Duty of Care*, 48 Creighton L. Rev. 245, 252 n.33 (2015).  It is unclear how this distinction bears on a public adjuster's knowledge of claims handling practices and coverage issues.[19]  Moreover, although public adjusters may not be "regulated by the practices of any particular insurance company," they are required to "adhere to state and federal laws and regulations."  *Id.*

Defendant also ignores the breadth and variety of Mr. Young's experience.  In addition to being a certified public adjuster, Mr. Young is trained in SIU adjusting,[20]

---

[19]Mr. Young specifically testified that his public adjusting firm "handle[s] issues of . . . coverage."  Docket No. 84-2 at 9, 45:25-46:1.

[20]Defendant argues that Mr. Young has never actually worked as an SIU adjuster and only obtained the certificate in order to attend SIU meetings.  *See* Docket No. 85 at 3; *see also* Docket No. 84-2 at 11, 53:25-54:3.  But it is not clear how Mr. Young's motivations for seeking an SIU adjuster certificate have any bearing on his training or knowledge in the area.  *See* Docket No. 84-2 at 11, 54:4-7 (testifying that he completed forty hours of continuing education requirements to receive SIU certificate).  Moreover, Mr. Young's training in SIU adjusting is supplemented by actual work experience in other areas of the insurance adjusting field.

owns and operates a one-year training program for in-house insurance adjusters, contributes to publications on insurance topics, and participates in continuing education training on state-specific laws governing the insurance industry. His experience is thus not limited to public claims adjusting. Although defendant argues that Mr. Young has never worked as an attorney, let alone practiced law in Colorado, *see* Docket No. 85 at 3, Mr. Young is licensed as both a public adjuster and an instructor on insurance topics in Colorado. *See* Docket No. 83-1 at 12, 14. These certifications indicate that he is sufficiently knowledgeable about Colorado laws and regulations governing the insurance industry to offer expert opinions. The question is whether the opinions that defendant has challenged are otherwise admissible.

### b. Reliability

Defendant challenges the reliability of certain opinions expressed in Mr. Young's expert report. *See* Docket No. 83 at 5-8, 11-15. Specifically, defendant argues that: (1) Mr. Young did not apply a methodology to reach his conclusions, *id.* at 6; (2) the methodology employed by Mr. Young is unreliable because he fails to address the ultimate fact question (*i.e.*, whether defendant complied with industry standards), Mr. DeBoer's analysis of plaintiff's financial records, and the legal standards cited in Mr. Young's report, *id.* at 6-7; and (3) Mr. Young's opinions are conclusory and/or based on insufficient facts or data. *Id.* at 12-15.

Defendant's arguments challenge the methodology employed by Mr. Young in reaching his conclusions. *See* Docket No. 83 at 6. As plaintiff argues, the purpose of standard of care experts in bad faith litigation is to "[a]pply[] the facts of a case to the

applicable industry standards." Docket No. 84 at 6; *see also O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 925 (D. Colo. 2017) (finding that bad faith expert's methodology, which consisted of "explaining what he [knew] of insurance industry standards and practices based on his experience, explaining the facts and evidence he reviewed in this case, then opining on the ways he believe[d] Geico's handling of Plaintiff's claim fell short [of] the relevant industry standards" was "sufficiently reliable" for expert to offer admissible testimony under Rule 702). Here, Mr. Young reviewed the litigation documents, applicable Colorado statutes, treatise materials, and FC&S bulletins in formulating his opinions.[21] *See* Docket No. 84 at 6; Docket No. 83-2 at 1-2; Docket No. 84-2 at 5, 11:4-12:7. While this type of review is consistent with the methodology typically employed by experts in bad faith litigation, *see O'Sullivan*, 233 F. Supp. 3d at 925, the Court largely agrees with defendant that Mr. Young did not reliably apply that methodology in reaching his conclusions.

Specifically, although Mr. Young makes factual "observations" based on the evidence and cites authorities ostensibly reflecting insurance industry standards, his ultimate conclusions do not clearly apply those standards to the facts. *See* Fed. R. Evid. 702(b)-(d) (requiring that the testimony be "based on sufficient facts or data," that the testimony be "the product of reliable principles and methods," and that the expert

---

[21]According to the website cited by plaintiff, FC&S stands for "Fire, Casualty, & Surety Bulletins." www.nationalunderwriterpc.com/Pages/AboutUs.aspx (last visited Jan. 17, 2018). This service was "started in 1929 by Edward J. Wolgemuth, founder of The National Underwriter Company." *Id.* Today, it professes to be the "premier property and casualty information service" and a well known "authority on insurance coverage interpretation and analysis for the [property and casualty] industry." www.nationalunderwriterpc.com/Pages/default.aspx (last visited Jan. 18, 2018).

"reliably appl[y] the principles and methods to the facts of the case").  Instead, many of

his opinions reflect his own interpretations of the evidence – interpretations that are

both unhelpful to the jury, which is capable of interpreting the evidence without expert

assistance, and unsupported.  The Court finds that the following challenged opinions in

Mr. Young's expert report suffer from these flaws: (1) Ms. Larson lacked final authority

regarding the claim, Docket No. 83-2 at 5; (2) the Home Office prevented Ms. Larson

from paying plaintiff's claim and forced her to assert every possible argument against

paying the claim, *id.*; (3) "[w]hen the value of the claim went up and the reserves were

adjusted, the claim became harder to resolve," *id.*; (3) "[w]hen an insurer assigns its SIU

to a claim it is to find a reason not to pay the claim," *id.* at 6;[22] (4) "[w]hen the insured

filed a police report with the Arvada Police Department, he subjected himself to

investigation as to whether the filing of the police report was accurate because there

are grave penalties to a party filing a false police report," *id.*; and (5) through his

testimony that every claim must be treated differently, "Donald Gibson seems to be

saying that Owners Insurance Company has no [standards for reasonable claims

handling]."  Docket No. 83-3 at 3.  Plaintiff argues that these opinions are "extrapolated

from the fact that Owners denied TBL's claim for failure to present a 'complete

inventory' of stolen coins" when plaintiff had already provided the handwritten list and

APD Report and allowed access to its books and records.  *See* Docket No. 84 at 12.

But plaintiff's argument does not address, let alone remedy, Mr. Young's failure to

explain the basis for each of his conclusions.  Moreover, to the extent Mr. Young's

---

[22]Defendant characterizes this opinion as "Owners was looking for reasons to
deny the claim."  Docket No. 83 at 14; Docket No. 85 at 8.

opinions are based solely or primarily on his experience as a public adjuster, he was required to "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendments). He has failed to do so. The Court therefore finds that the opinions identified above do not satisfy the foundational requirements of Fed. R. Evid. 702(b)-(d). Accordingly, those opinions will be excluded.

The Court reaches the opposite conclusion as to Mr. Young's statements regarding the legal standards applicable in this case. Defendant challenges the following statements in Mr. Young's report:

> *Couch on Insurance* points out, however, that [a provision requiring the insured to provide an inventory of damaged and undamaged property] "must be given a reasonable construction, and should not be used to relieve the insurer from liability for loss where literal compliance with the contract has become impossible. . . ."

Docket No. 83-2 at 5.

> Colorado Law (Colorado Revised Statute § 10-2-1104) requires an insurer to effectuate a prompt fair and equitable settlement of claims when liability has become reasonably clear.

*Id.* at 6.[23]

> Colorado's Unfair Claims Practices Act requires each insurer to develop standards for reasonable claims handling. (Colorado Revised Statute § 10-3-1104(h)).

Docket No. 83-3 at 3.

---

[23]As defendant points out, this opinion misstates the citation for the applicable statute. *See* Docket No. 83 at 7. The correct citation is Colo. Rev. Stat. § 10-3-1104.

> State Statutes and Standard of Care in the Industry also dictate
> appropriate behavior in the adjustment of claims.

*Id.* at 2.

Defendant contends that these opinions are unreliable because Mr. Young fails to adequately describe the legal standards he cites. Docket No. 83 at 7. But defendant does not argue that Mr. Young's descriptions of the above-cited legal standards are inaccurate or that the standards themselves are irrelevant to the issues in the case. Accordingly, defendant's argument goes to the reliability of Mr. Young's application of the standards to the facts in this case, not to the reliability of his citations to the standards themselves. Mr. Young's purported lack of comprehension as to the relevant legal standards may call into question the reliability of his ultimate conclusions regarding the reasonableness of defendant's conduct; however, it is not a sufficient basis for excluding any reference to the applicable legal standards. These opinions will therefore not be excluded.[24]

The Court further declines to exclude certain factual statements deemed "erroneous" by defendant. Defendant specifically challenges the following statements

---

[24]In the same section of its motion to exclude, defendant argues that Mr. Young's methodology is unreliable because he fails to answer the ultimate fact question in the case – whether defendant complied with industry standards – and does not discuss the results of Paul DeBoer's financial analysis. *See* Docket No. 83 at 6-7. Defendant does not identify the specific opinions it seeks to exclude on these bases. *See* Practice Standards (Civil Cases), Judge Philip A. Brimmer § III.G ("The motion shall identify with specificity each **opinion** the moving party seeks to exclude . . . [as well as] the specific ground(s) on which each opinion is challenged . . . ."). In any event, the Court finds that Mr. Young's purported failure to give an ultimate opinion as to defendant's compliance with industry standards or discuss the findings of Paul DeBoer goes more to the weight and credibility of Mr. Young's opinions than to their admissibility. Accordingly, these perceived shortcomings do not warrant the wholesale exclusion of Mr. Young's testimony.

in Mr. Young's expert report: (1) "Jayme Larson testified in her deposition that the conduct of Auto Owners in this case was unreasonable," Docket No. 83-2 at 3; (2) the applicable insurance policy requires the insured to submit to an examination under oath as a duty after loss, *id.* at 4; (3) "Owners would not accept [the hundred of pages of documents submitted by TBL Collectibles, including past business records and the Arvada Police Department Inventory, as] proof of the loss," *id.*; and (4) Donald Gibson is an SIU adjuster. Docket No. 83-3 at 3; Docket No. 83 at 12.[25] To the extent these opinions or statements are inaccurate, the Court finds, as it did with respect to Mr. Craver's statements above, that the accuracy of Mr. Young's interpretation of the evidence is an issue more appropriately reserved for trial.

### c. Whether Opinions Will Assist the Trier of Fact

Defendant argues that certain of Mr. Young's opinions will not assist the trier of fact because they are either irrelevant, *see* Docket No. 83 at 8, or generally unhelpful to resolving the issues in this case. *See id.* at 11.

Defendant first contends that Mr. Young's opinions regarding the SIU have no bearing on the ultimate issues in the case – whether plaintiff complied with the terms of the policy and whether defendant acted unreasonably in denying the insurance claim. Docket No. 83 at 8. In his expert report, Mr. Young makes three references to the SIU. First, he observes that "Mr. Gibson told [Ms. Larson] that this claim should be run past

---

[25]Defendant also challenges as erroneous Mr. Young's statements that Ms. Larson lacked authority over plaintiff's claim and that the Home Office prevented her from authorizing payment. *See* Docket No. 83 at 12. Setting aside the fact that these statements appear to be statements of opinion rather than fact, the Court notes they have already been excluded as unsupported.

SIU," Docket No. 83-2 at 3.  Second, he suggests that "[t]he Home Office blocked [Ms. Larson] from paying the claim and forced her to throw every possible argument not to do so," including "reporting the claim to the SIU."  *Id.* at 5.  Finally, Mr. Young opines that

> the SIU (Special Investigative Unit) is called upon to review claims when one or more issues exist: (1) there is suspected fraud involved, (2) there is questions of coverage or (3) when the insurer suspects a lawsuit.  When an insurer assigns its SIU to a claim it is to find a reason not to pay the claim.  The SIU in this case saw no reason to proceed and, after a brief review, took the SIU out of further investigation of the claim.

*Id.* at 6.[26]  Defendant argues that the SIU investigation is entirely irrelevant to this case because defendant does not assert that Mr. Wray was dishonest in the reporting of his claim.  Docket No. 83 at 9.  The Court agrees.  As discussed above, there is no evidence that defendant suspected plaintiff of having filed a false or fraudulent claim or that defendant denied plaintiff's claim on that basis.[27]  Accordingly, Mr. Young's statements regarding the SIU are not necessary to "rebut any insinuation that Owners denied [plaintiff's] claim because TBL or its principle [sic], Bruce Wray, were being untruthful about the loss."  Docket No. 84 at 10.  These statements will therefore be excluded.

Finally, defendant challenges Mr. Young's assertions that (1) "Owners Insurance

---

[26]Defendant also notes Mr. Young's misunderstanding as to Mr. Gibson's relationship to the SIU  *See* Docket No. 83 at 9.  As previously discussed, however, that misunderstanding was corrected during Mr. Young's deposition and is unlikely to come up at trial.

[27]Although Mr. Craver's statement that "there is a strong public policy within [Colorado] wherein the state is critically interested in investigating and stopping insurance fraud," Docket No. 54-1 at 9, might have created an implication to that effect, the statement has been excluded as irrelevant.

Company has attempted to create a level of ownership proof that the insured cannot meet when in fact, the insured HAS complied with the Duties After Loss provision of his policy," and (2) Owners has failed to "effectuate a prompt fair and equitable settlement of claims." Docket No. 83-2 at 6; Docket No. 83 at 11. Defendant argues that these are unhelpful conclusory opinions because Mr. Young never explains what "'reasonableness' means within the context of insurance claims handling in Colorado" or "how Owners' failed to comport with such standards." Docket No. 83 at 11. The Court agrees. Although Mr. Young appears to base his opinions – at least in part – on the standards set forth in § 10-3-1104, he does not articulate the factual basis for his conclusions or explain how the standards applied relate to the issue of defendant's reasonableness. As the Supreme Court has noted, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Accordingly, these opinions will be excluded.

## III. SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes

over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

## B. Analysis

Defendant moves for summary judgment on plaintiff's claims for declaratory

judgment, breach of contract, and insurance bad faith under § 10-3-1115. Plaintiff has filed a cross motion for summary judgment on the declaratory judgment claim.

### *1. Declaratory Judgment*

Plaintiff's first claim for relief seeks a declaratory judgment that (1) plaintiff has substantially complied with the terms of the insurance policy and (2) defendant is estopped from requiring, and/or has waived the right to require, further documentation of the existence and/or value of the stolen bullion coins. *See* Docket No. 1 at 11, ¶¶ 46-47.

Because declaratory judgment acts are procedural rules, "federal law determines whether a district court may properly enter a declaratory judgment" in a diversity case. *Addison Ins. Co. v. Maynard*, 08-cv-00054-WDM-BNB, 2008 WL 2079143, at *2 (D. Colo. 2008). The federal Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "[T]he question of whether this power should be exercised in a particular case is vested in the sound discretion of the district courts." *St. Paul Fire & Marine Ins. Co. v. Runyon*, 53 F.3d 1167, 1168 (10th Cir. 1995).

The Tenth Circuit has identified five factors ("*Mhoon* factors") a district court should consider in determining whether to exercise its discretion to hear a declaratory judgment action:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3]

whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to *res judicata*"; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

*Id.* at 1169 (quoting *State Farm & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994). Courts in this district have additionally looked to a sixth factor set forth in *Constitution Associates v. New Hampshire Insurance Co.*, 930 P.2d 556 (Colo. 1997) – whether the declaratory judgment action is "independent of and separable from the underlying action." *Constitution Assocs.*, 930 P.2d at 561; *see, e.g.*, *Ace Am. Ins. Co. v. Dish Network, LLC*, No. 13-cv-00560-REB-MEH, 2014 WL 811993, at *16 (D. Colo. Mar. 3, 2014) (finding analysis in *Constitution Associates* "instructive and in accord with an analysis of the *Mhoon* factors"); *Addison Ins. Co. v. Rippy*, No. 08-cv-00237-PAB-MJW, 2009 WL 723322, at *6 (D. Colo. Mar. 18, 2009) (noting that cases in this district have found "independent and separable" requirement in *Constitution Associates* to be instructive on issue of whether anticipatory declaratory judgment action would prejudice insured in underlying case); *Maynard*, 2008 WL 2079143, at *2-3 (applying "independent and separable" factor from *Constitution Associates* in determining whether to hear declaratory judgment action); *see also Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1093-94 (10th Cir. 2010) (declining to decide whether "state law rule purporting to prevent parties from seeking a declaratory judgment until a specified time could bind a federal district court," but citing with approval holding in *Constitution Associates* that "a declaratory judgment is permissible if it concerns issues that are independent of and separable from those in the underlying

action" (internal quotation marks and emphasis omitted)).  Citing this factor, defendant argues that plaintiff's request for declaratory relief is improper because it is not independent of or separable from the other claims asserted in this action.  *See* Docket No. 67 at 12-13.  The Court agrees.

Courts have typically applied the factors listed above to decline jurisdiction over declaratory judgment claims where there is parallel litigation in state and federal courts, *see Golf Club, L.L.C. v. Am. Golf Corp.*, 2017 WL 1655259, at *2 (W.D. Okla. May 2, 2017); *St. Paul Fire & Marine Ins. Co.*, 53 F.3d at 1169-70, or where resolution of the declaratory judgment claim would prejudice an insured in an underlying liability action by a third party.  *See Valley Forge Ins. Co.*, 616 F.3d at 1094 (stating that "declaratory judgment action *is* permissible if it concerns issues that are independent of and separable from those in the underlying action, because . . . it then would not unduly prejudice the insured in the underlying action" (internal quotation marks omitted)); *Maynard*, 2008 WL 2079143, at *2-3 (explaining meaning and purpose of "independent and separable" requirement).  However, courts in this circuit have also dismissed declaratory judgment claims in circumstances similar to those presented here – where a plaintiff seeks declaratory relief that would resolve the same issues raised by other claims brought in the same action.  *See, e.g.*, *Golf Club, L.L.C.*, 2017 WL 1655259, at *2 (finding that *Mhoon* factors weighed in favor of dismissal where "plaintiff fail[ed] to identify any issue for resolution by declaratory relief that [could not] be resolved in the context of its separate claim for breach of contract"); *PDX Pro Co., Inc. v. Dish Network, LLC*, No. 12-cv-01699-RBJ, 2013 WL 3296539, at *2 (D. Colo. July 1, 2013)

(dismissing declaratory judgment claim on ground that there was no "forward-looking need to resolve the damages" issue raised in that claim because it would be "resolved in deciding plaintiff's allegations of breach of contract and duty of good faith and fair dealing"); *Cleveland v. Talent Sport, Inc.*, 2013 WL 2178272, at *3 (W.D. Okla. May 17, 2013) (dismissing declaratory judgment claim without prejudice on ground that it "serve[d] no useful purpose" because "all issues identified for resolution by declaratory judgment [would] be decided in adjudicating [plaintiff's] other claims"); *U.S. Aviation Underwriters, Inc. v. Dassault Aviation*, 505 F. Supp. 2d 1252, 1271 (D. Wyo. 2007) (finding cases concerning "conflicting jurisdiction and comity considerations" inapplicable, but holding that dismissal of declaratory judgment claim was nevertheless warranted because "accident and resulting economic loss . . . [had] already occurred" and declaratory judgment claim merely "[sought] to address [plaintiffs'] breach of contract/warranty claims in a declaratory judgment context"); *but see Lindley v. Life Investors Ins. Co. of Am.*, 2009 WL 2163513, at *4 (N.D. Okla. July 17, 2009) (declining to dismiss counterclaim for declaratory relief where there was "no possibility that hearing defendant's counterclaim [would] create needless friction between state and federal courts]" and counterclaim was "not a mirror image of the complaint").  The holdings in these cases have rested on one of two rationales.  Some courts have assumed that the *Mhoon* factors "may . . . guide a decision whether to entertain a separate declaratory judgment claim," even in the absence of pending litigation in state court.  *Golf Club, L.L.C.*, 2017 WL 1655259, at *2; *Cleveland*, 2013 WL 2178272, at *3. Applying those factors, the courts have determined that a declaratory judgment claim

"serves no useful purpose" where it raises issues that will necessarily be resolved in the context of other claims asserted in the same action. *Golf Club, L.L.C.*, 2017 WL 1655259, at *2; *Cleveland*, 2013 WL 2178272, at *3. Other courts have reached a similar conclusion without relying on the *Mhoon* factors. In *PDX Pro Co.*, for example, the court determined that dismissal of the plaintiff's declaratory judgment claim was appropriate where the alleged breach of contract had already occurred and the damages issue raised by the declaratory judgment claim would necessarily be addressed by the resolution of the plaintiff's breach of contract allegations. 2013 WL 3296539, at *2. The court reasoned that, under the circumstances, there was no "forward-looking need" to address the damages issue through a declaratory judgment. *Id.*; *accord U.S. Aviation Underwriters*, 505 F. Supp. 2d at 1271 (dismissal of declaratory judgment claim appropriate where claim did not "seek to avoid threats of future liability or otherwise avoidable losses and unnecessary damages").

The Court finds both of these rationales persuasive. Assuming the *Mhoon* factors apply in cases such as this where there is no pending state court litigation, the Court finds that the first, second, and fifth factors weigh in favor of dismissal.[28] Although a declaration that plaintiff complied with its obligations under the insurance policy would help to clarify the parties' legal relationship, it would not resolve the entirety of the dispute. It is also not clear that a separate adjudication of plaintiff's claim for declaratory relief would serve any useful purpose, given that the question of whether plaintiff fulfilled its duties under the insurance contract will necessarily be addressed in

---

[28]The second and third factors appear to be inapplicable in this case because the Court is unaware of pending litigation in any other forum.

the Court's resolution of plaintiff's breach of contract and bad faith claims.  *See Golf Club, L.L.C.*, 2017 WL 1655259, at \*2.  Finally, plaintiff's claims seeking money damages for the alleged breach of contract provides a more complete remedy than a mere declaration that plaintiff performed its duties under the contract.

However, even if the *Mhoon* factors do not apply, the Court agrees with the rationale in *PDX Pro Co.* and *United States Aviation Underwriters.*  As the Tenth Circuit has noted, the Declaratory Judgment Act "enables parties uncertain of their legal rights to seek a declaration of rights prior to injury."  *Kunkel v. Continental Cas. Co.*, 866 F.2d 1269, 1274 (10th Cir. 1989).  That purpose is not served where, as in this case, the injury has already occurred and the declaratory judgment claim merely seeks relief that will be afforded by the resolution of plaintiff's claims for breach of contract and insurance bad faith.  *See PDX Pro Co.*, 2013 WL 3296539, at \*2.

In short, the Court discerns no reason – and plaintiff offers none – for issuing a declaratory judgment when the parties' obligations under the insurance policy will necessarily be resolved in the context of plaintiff's breach of contract and bad faith claims.  Accordingly, the Court finds that summary judgment in favor of defendant on this claim is appropriate.

### 2.  Breach of Contract

Defendant also seeks summary judgment on plaintiff's breach of contract claim.

In Colorado, "a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by

the defendant; and (4) resulting damages to the plaintiff." *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (internal citations omitted). Defendant argues that plaintiff's claim fails on the second element because plaintiff did not fulfill its obligations under the insurance policy. Docket No. 63 at 9.

As relevant here, plaintiff's insurance policy listed eight duties that plaintiff was required to perform in the event of a loss:

> (1) Notify the police if a law may have been broken. (2) Give us prompt notice of the loss or damage. Include a description of the property involved. (3) As soon as possible, give us a description of how, when and where the loss or damage occurred. (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. . . . (5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed. (6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records. Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records. (7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. . . . (8) Cooperate with us in the investigation or settlement of the claim.

Docket No. 63-12 at 9 ("Duties in the Event of Loss or Damage"). Defendant has admitted that, at all relevant times, Ms. Larson believed that plaintiff had complied with duties one through four and six through eight. *See* Docket No. 62 at 5, ¶¶ 12, 14. Defendant's only argument as to this claim is that plaintiff failed to provide a "complete inventory" as required under duty five. *See id.*, ¶ 14; Docket No. 63 at 9-12.

It is undisputed that Mr. Wray did not maintain up-to-date records of his purchases and sales of gold coins. Docket No. 63 at 4, ¶ 8. After the burglary, however, he created a handwritten list of the stolen coins from memory and provided it

to defendant.  *See* Docket No. 67 at 5, ¶ 12.  The list included descriptions, quantities,

and costs for each coin.  Docket No. 62 at 6, ¶¶ 17-18.  Plaintiff also supplied

defendant with the APD report, which contained a similar list of the stolen coins created

from Mr. Wray's memory, along with additional items Mr. Wray remembered and

identified at a later date.  *Id.* at 6-7, ¶¶ 18, 20.  The total amount of plaintiff's claimed

loss could be calculated by adding the costs identified in the complete list of stolen

items contained in the APD Report.  *Id.* at 7, ¶ 20.[29]  Defendant argues that neither the

handwritten list nor the APD Report qualifies as a "complete inventory" under the terms

of duty five.  Docket No. 63 at 9-12.

Duty five does not define "inventory."  Docket No. 68 at 8, ¶ 23.  Defendant

argues that the term should be read in light of plaintiff's insurance policy as a whole,

which covered business personal property[30] in plaintiff's retail store.  Docket No. 63 at

---

[29]The insurance policy also requires that the "inventory" include "values" for the
lost items.  Docket No. 63-12 at 9.  However, defendant has admitted that, because the
value of bullion coins fluctuates based on the value of gold or silver, defendant was only
interested in the amount Mr. Wray paid for the coins – i.e., their "cost."  Docket No. 62
at 6, ¶ 19.  In other words, defendant does not claim that plaintiff failed to comply with
duty five merely because neither the handwritten list nor the APD Report listed a value
for each coin separate from the cost of that coin.

[30]Under the policy, "business personal property" consists of the following:

(1) [f]urniture and fixtures; (2) [m]achinery and equipment; (3) "[s]tock"; (4)
[a]ll other personal property owned by [the policyholder] and used in [the
policyholder's] business; (5) [l]abor, materials or services furnished or
arranged by [the policyholder] on personal property of others; (6) [the
policyholder's] use interest as tenant in improvements and betterments . .
. ; (7) [l]eased personal property for which [the policyholder has] a
contractual responsibility to insure . . ..

Docket No. 63-12 at 1.

10-11; Docket No. 67 at 14.  Defendant appears to contend that, given that this is a business policy, the term "inventory" necessarily signifies a detailed and up-to-date record of merchandise.  *See* Docket No. 63 at 10-11; Docket No. 67 at 14-15.  To support this position, defendant relies on the following definition of "retail inventory method," which is ostensibly found in the second edition of Black's Law Dictionary:[31]

> [t]he estimated value at the end of an inventory procedure that is based on retail price and cost.  Includes the following steps: (1) maintaining detailed records of stock and prices, (2) computation of cost to retail percentage, (3) estimation of price of goods remaining against price of goods sold and (4) conversion of the estimation of inventory at a retail price as compared to the cost price.

Docket No. 63 at 10; Docket No. 67 at 15.  The term "retail inventory method" does not appear in the policy, and defendant cites no cases that construe "inventories" in duty five to require a policyholder to employ the "retail inventory method" in order to fulfill its duties in making a claim.

In Colorado, "[t]he interpretation of an insurance contract is a question of law" to which traditional principles of contract interpretation apply.  *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1059 (Colo. 2005); *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990).[32]  Thus, courts construing the terms of an insurance policy

---

[31]The Court was unable to find a definition of "retail inventory method" in the second edition of Black's Law Dictionary.  The cited definition can, however, be found at http://thelawdictionary.org/retail-inventory-method/.  The website purports to "featur[e]" the second edition of Black's Law Dictionary.

[32]The parties do not cite to any choice-of-law provision in the insurance policy, but they appear to agree that Colorado law governs the interpretation of the insurance policy.  *See generally* Docket No. 62 at 10-11; Docket No. 67 at 14.  The Court will operate under the same premise.  *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

must "give effect to the intent and reasonable expectations of the parties." *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007). This means affording words in the policy "their plain meaning according to common usage" and avoiding "strained constructions." *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 18 (Colo. 1990). When policy language is ambiguous – i.e., when it is "reasonably susceptible on its face to more than one interpretation" upon evaluation of the policy as a whole, *State Farm Mut. Auto Ins. Co. v. Stein*, 940 P.2d 384, 387 (Colo. 1997) – it must be "construed against the insurer . . . and in favor of the insured." *Id.* at 390.

The Court finds that there is nothing in the phrase "complete inventories" in duty five that requires plaintiff to tender a pre-existing and up-to-date record of purchases and sales. First, the dictionary definition of "inventory" is "a detailed list of assets," "an itemized list of current assets," or "the quantity of goods or materials on hand," *Inventory*, Black's Law Dictionary (10th ed. 2014); *Inventory*, Merriam Webster's Collegiate Dictionary (11th ed. 2007), indicating that an "inventory" is simply a list of items. And although the parties do not cite any cases interpreting similar policy terms, decisions of this Court have taken for granted that a list of stolen items, created after a theft, can qualify as an "inventory" for insurance purposes. *See, e.g.*, *Walker v. State Farm Fire & Cas. Co.*, No. 16-cv-00118-PAB-STV, 2017 WL 1386341, at *6 (D. Colo. Feb. 23, 2017) (noting that plaintiff "provided an *inventory* of the stolen property" where he supplied insurance company with list of stolen items after theft, but granting summary judgment for defendant on ground that plaintiff failed to comply with separate policy term requiring submission of "bills, receipts, and related documents that

substantiate the figure in the inventory" (emphasis added)), *report and recommendation adopted by* 2017 WL 1386346 (D. Colo. Mar. 17, 2017).[33]

Second, the phrase "complete inventories" contemplates more than a single record of purchases and sales. The phrase appears to require an insured to provide separate "inventories" of both damaged and undamaged property – a task that would be impossible before a loss occurs. Further, because the term "complete" is most naturally read as modifying both types of "inventories," an insured satisfies its obligations under duty five by providing, at the insurer's request, a complete inventory of damaged property and a complete inventory of undamaged property. Ms. Larson testified that she did not request a complete inventory of undamaged property, *i.e.*, items not stolen. Docket No. 68-3 at 11, 133:18-24. Thus, plaintiff's list of stolen property appears to satisfy plaintiff's obligations under the plain language of duty five.

This conclusion is further supported by duty five's use of the term "include." Duty five states: "give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed." Docket No. 63-12 at 9.

_____

[33]As discussed above, defendant appears to suggest that, because the bullion coins constituted "stock," the term "inventory" must be read in the context of common retail practices. *See* Docket No. 63 at 6, ¶ 16; Docket No. 67 at 14-15. But defendant does not direct the Court to any language in the policy – other than the phrase "complete inventories" – to support such an interpretation, and the Court is obligated to avoid "strained constructions" in order to give effect to the reasonable intent and expectations of the parties. *Allstate Ins. Co. v. Starke*, 797 P.2d at 18. The Court further notes that whether defendant actually considered the bullion coins to constitute "stock" under the insurance policy is a point of disagreement between the parties. *See* Docket No. 68 at 6, ¶ 16; *see also* Docket No. 67-11 at 11 (11/6/15 claims note entry stating that "coins would not be considered stock" under policy). And defendant has averred that "[t]he specific Policy classification of the allegedly stolen coins is irrelevant." Docket No. 77 at 3, ¶ 8.

Because the word "include" instructs the policyholder how to create the "complete inventories" (i.e., make sure the inventory includes quantities, costs, etc.), it supports an interpretation of duty five that the inventories are created after the loss.  Use of the word "include" as a directive is inconsistent with defendant's interpretation since, under defendant's theory, the inventory already exists.  Directing the insured on what to include in the "inventories" makes sense only if the inventories are created after the loss.  In this case, Mr. Wray supplied defendant with an inventory of stolen coins that he created from memory after the burglary.  The Court finds that this satisfied plaintiff's obligations under the plain language of the insurance policy.

To the extent that the term "inventory" is ambiguous, the Court reaches the same conclusion.  Ambiguous policy terms must be "construed against the insurer . . . and in favor of the insured."  *State Farm Mut. Auto Ins. Co.*, 940 P.2d at 390.  Thus, even if "inventory" is susceptible to defendant's interpretation, plaintiff's construction of the term as requiring only a list of items created after a loss must prevail.

Defendant argues, in the alternative, that even if an "inventory" can be created from memory, the Court should grant summary judgment because plaintiff has provided no documentation substantiating the ownership or existence of the specific coins allegedly stolen.  Docket No. 63 at 12; Docket No. 67 at 17; Docket No. 77 at 8.  This argument is unavailing for two reasons.  First, defendant does not point to any policy language requiring the insured to provide such documentation.[34]  Although insurance policies sometimes contain a provision requiring the insured to produce documentation

---

[34]Defendant does not argue that there is an implied term in the insurance contract imposing such a requirement.

48

substantiating the claimed loss, *see, e.g.*, *Walker*, 2017 WL 1386341, at *5 (insurance policy requiring insured to provide inventory of stolen property and to "[a]ttach to the inventory all bills, receipts, and related documents that substantiate the figure in the inventory"), the policy in this case contains no such requirement.[35]  Second, when viewed in a light most favorable to plaintiff, the record shows that plaintiff did produce documentation to substantiate the existence and ownership of the stolen coins.[36] These documents included bank statements and check copies, which established a pattern and practice of buying bullion coins of the type allegedly stolen from the safe. *See* Docket No. 62-23 at 3; Docket No. 62-32 at 2; Docket No. 67-11 at 5-6 (1/15/16 entry).  Defendant argues that this documentation does not substantiate the existence and ownership of the exact coins stolen, but defendant fails to identify any express or

---

[35]The policy does require the insured to "permit [the insurance company] to inspect the property proving the loss . . . and examine [the insured's] books and records."  Docket No. 63-12 at 9 ("Duties in the Event of Loss or Damage").  But defendant does not argue – and the Court does not find – that this provision requires an insured to produce documents proving the existence and/or ownership of the lost items. Moreover, it is undisputed that defendant's denial of plaintiff's insurance claim was not predicated on plaintiff's failure to comply with this policy term.  *See* Docket No. 62 at 5, ¶¶ 12, 14; *see also Colard*, 709 P.2d at 15 (holding that insurer waived right to assert particular defense to liability by not raising it until litigation following denial of insurance claim).

[36]Defendant disputes this fact, asserting that "Paul DeBoer's analysis actually revealed that there was no substantiation of the existence of the coins."  Docket No. 67 at 8, ¶ 22.  But the document cited by defendant does not support this proposition.  *See* Docket No. 63-9 at 1 (explaining that "purchases by check would likely represent the building of saleable inventory . . . and the purchase by invoice from the broker, largely, would result in brokerage fees").  Moreover, there is some indication in the record that DeBoer initially declined to express an opinion on whether the documents provided were sufficient to substantiate the claimed loss.  Instead, he informed defendant that it was defendant's choice whether to base the claim on the "exact documented loss" or on plaintiff's "spending pattern."  Docket No. 67-11 at 3-4 (2/1/16 entry).

implied term in the insurance policy requiring an insured to provide that level of proof in support of a claim.

In summary, the Court finds that plaintiff complied with its obligations under the insurance policy and thus defendant is not entitled to summary judgment on plaintiff's breach of contract claim.[37]

### 3. Unreasonable Delay or Denial of Benefits Under Colo. Rev. Stat. § 10-3-1115

Defendant also moves for summary judgment on plaintiff's claim for insurance bad faith under Colo. Rev. Stat. § 10-3-1115. That section provides that "[a] person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant." § 10-3-1115(1)(a). Plaintiff must therefore show that: (1) benefits were owed under the policy; and (2) defendant unreasonably delayed or denied payment of plaintiff's claim. *See* § 10-3-1115; *Edge Construction, LLC v. Owners Ins. Co.*, No. 14-cv-00912-MJW, 2015 WL 4035567, at *6 (D. Colo. June 29, 2015) ("[I]n order to prevail on its statutory unreasonable delay/denial claim, [plaintiff] first has to prove entitlement to benefits."); *see also MarkWest Hydrocarbon, Inc. v. Liberty Mut. Ins. Co.*, 558 F.3d 1184, 1192-93 (10th Cir. 2009) ("It is settled law in Colorado that a bad faith claim must fail if . . . coverage was properly denied and the plaintiff's only claimed damages flowed from the denial of coverage."). An insurer's delay or denial of payment is unreasonable if the

---

[37]Given the Court's determination that plaintiff complied with its obligations under the insurance policy, the Court need not address plaintiff's alternative argument that defendant has waived the right to require, and/or should be estopped from requiring, additional documentation substantiating plaintiff's claim. *See* Docket No. 68 at 15-17.

insurer lacked a "reasonable basis for that action." § 10-3-1115(2).

Although what constitutes "reasonableness" in the insurance context "is ordinarily a question of fact for the jury," *Chateau Village N. Condominium Ass'n v. Am. Family Mut. Ins. Co.*, 170 F. Supp. 3d 1349, 1360 (D. Colo. 2016) (citing *Vaccaro*, 275 P.3d at 759), defendant contends that summary judgment is appropriate in this case for three reasons: (1) plaintiff failed to provide defendant with any documentation substantiating the claimed loss and thus defendant had a reasonable basis for denying the claim; (2) defendant relied on the findings and opinions of an independent expert in denying plaintiff's claim; and (3) plaintiff has presented no admissible evidence showing that defendant breached applicable industry standards. *See* Docket No. 63 at 15-18.

Defendant first argues that, because plaintiff failed to adequately substantiate its loss, defendant had a reasonable basis for denying the claim. *See id.* at 13-15. As the Court determined above, plaintiff complied with its duties under the insurance policy. Moreover, defendant's insurance expert, Mr. Craver, stated in his report that "there is no regulation, statute or formula to determine the adequacy of proof of ownership to substantiate the loss." Docket No. 54-1 at 10. As a result, defendant fails to show that its denial of the claim was reasonable as a matter of law.

Defendant also suggests that plaintiff's failure to substantiate its losses made the claim "fairly debatable" and therefore subject to summary judgment in defendant's favor. Defendant cites *Glacier Construction Co. v. Travelers Property Casualty Co. of America*, 569 F. App'x 582 (10th Cir. 2014) (unpublished), for the proposition that it is "reasonable for an insurer to challenge claims that are 'fairly debatable.'" *See* Docket

No. 63 at 13.  As the court in *Glacier* recognized, however, a "'fairly debatable' showing, standing alone, is insufficient to support summary judgment for the insurer."  *Glacier Constr. Co.*, 569 F. App'x at 590; *see also Home Loan Inv. Co.*, 827 F.3d at 1260-62 (rejecting argument that, "under Colorado law, an insurer cannot act unreasonably in denying a fairly debatable claim").  Therefore, whether or not the substantiation of plaintiff's claim made the claim "fairly debatable" does not entitle defendant to summary judgment.

Defendant next argues that summary judgment is appropriate because defendant relied on the findings and opinions of an independent expert – Paul DeBoer – in denying plaintiff's claim for benefits.  *See* Docket No. 63 at 15.  The cases defendant cites do not support this position.

Defendant relies primarily on *Adams v. Allstate Insurance Co.*, 187 F. Supp. 2d 1207 (C.D. Cal. 2002), where the court granted summary judgment in the insurer's favor on the plaintiffs' bad faith claim after finding that "a single, thorough report by an independent expert is sufficient, all other things being equal, to support application of the 'genuine dispute' doctrine."  187 F. Supp. 2d at 1215.  Defendant cites this portion of the decision to suggest that defendant's reliance on Mr. DeBoer's findings precludes any inference of bad faith.  But the court in *Adams* applied California law, which recognizes that the existence of a genuine dispute over insurance coverage can support summary judgment in an insurer's favor.  *See id.* at 1214 (discussing "genuine dispute" doctrine).  As noted previously, the "fair debatability" of an insurance claim does not, under Colorado law, preclude a finding that an insurer unreasonably delayed

or denied payment of benefits under § 10-3-1115. *See Home Loan Inv. Co.*, 827 F.3d at 1260-62. Even if it were appropriate to import principles of California law into this case, the court in *Adams* recognized that "reliance on 'expert testimony does not automatically insulate insurers from bad faith claims based on biased investigations.'" *Adams*, 187 F. Supp. 2d at 1215 (brackets omitted) (quoting *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 996 (9th Cir. 2001)). Moreover, *Adams*' determination that the plaintiffs had failed to raise any triable issues of fact as to defendant's bad faith was not based solely on defendant's reliance on an independent expert report to deny benefits – the plaintiffs also failed to present any admissible evidence to contradict the report regarding the cause of the property damage at issue. *See id.* at 1215-17.

Defendant's remaining cases are equally unpersuasive. *Crespo v. Unum Life Insurance Co. of America*, 294 F. Supp. 2d 980 (N.D. Ill. 2003), involves an appeal from an insurer's denial of ERISA benefits and thus arises in a distinct legal and factual context. *See id.* at 983 (noting that parties' cross-motions for summary judgment presented issue of whether insurer's actions were "arbitrary and capricious"); *see also id.* at 995-96 (noting that reliance on independent medical evaluations "is evidence of a thorough investigation" and thus generally precludes finding that insurer's denial of claim was "arbitrary and capricious"). And the cited portion of *Tucker v. State Farm Fire & Casualty Co.*, 981 F. Supp. 461 (S.D. Tex. 1997), merely offers another iteration of the "fair debatability" rule, which, as previously noted, is inconclusive of bad faith liability under Colorado law. *See id.* at 465; *see also Home Loan Inv. Co.*, 827 F.3d at 1260-62.

Defendant's final argument in favor of summary judgment is that plaintiff has failed to obtain any admissible evidence as to the industry standards defendant allegedly breached.  *See* Docket No. 63 at 18.  In support of this contention, defendant claims that Mr. Young is not qualified to opine as to the relevant industry standards and plaintiff "has not retained its own forensic accountant as an expert in this matter."  *Id.*

The Court agrees that "[t]he reasonableness of the insurer's conduct must be determined objectively, based on proof of industry standards," *Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 415 (Colo. 2004); however, plaintiff has provided such evidence in this case.  Contrary to defendant's assertions – and as previously discussed – Mr. Young's opinions regarding defendant's failure to comply with the standards set forth in § 10-3-1104 are admissible under Rule 702 as evidence of defendant's unreasonableness.  *See Meadows v. Elec. Ins. Co.*, No. 15-cv-02524-MEH, 2016 WL 7868824, at *9 (D. Colo. June 30, 2016) (noting that the Unfair Claims Practices Act "may be used as valid, but not conclusive, evidence of industry standards" (quoting *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 344 (Colo. 2004)).  Moreover, to the extent Mr. Young's testimony is somehow inadequate, expert testimony is not required to support a claim of bad faith if (1) a legislative enactment or administrative rule serves as evidence of the standard of care, and (2) the standard of care is within the "common knowledge and experience of ordinary persons."  *Allen*, 102 P.3d at 343-44 (internal quotation marks omitted); *see also Peden v. State Farm Mut. Auto. Ins. Co.*, 841 F.3d 887, 890 (10th Cir. 2016) (noting that insurance industry standards can be "established through expert opinions or state law").

The Court finds that these requirements are met in this case. Plaintiff contends that "Owners has misrepresented the provisions of the Policy, not attempted in good faith to effectuate the prompt, fair, and equitable settlement of this claim, and compelled TBL to institute litigation to recover amounts due under the Policy, all in violation of C.R.S. § 10-3-1104(1)(h)." Docket No. 68 at 19. As previously explained in this order and prior orders, § 10-3-1104(1)(h) provides "examples of conduct violative of [insurance] industry standards." *Leeper v. Allstate Fire & Cas. Ins. Co.*, No. 13-cv-03460-PAB-KMT, 2016 WL 1089701, at *6 (D. Colo. Mar. 21, 2016). A determination of whether defendant engaged in such practices is within the "common knowledge and experience of ordinary persons." *Allen*, 102 P.3d at 345 (finding that neither "[t]he reasonableness of an insurer's investigation into the underlying events of an automobile insurance claim" nor "a determination of what constitutes a reasonable explanation for denying a claim" required special knowledge or training). Thus, because the Court can instruct the jury as to the practices proscribed in § 10-3-1104(1)(h), expert testimony regarding industry standards is not required. *See Leeper*, 2016 WL 1089701, at *6; *Meadows*, 2016 WL 7868824, at *10 (denying summary judgment in favor of insurer despite plaintiff's "purported failure to designate an expert to testify on industry standards concerning the reasonableness of [defendant's] investigation of her UIM claim"). For these reasons, the Court finds that defendant is not entitled to summary judgment on plaintiff's statutory bad faith claim.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Motion to Exclude Certain Opinions and Testimony of Defendant's Expert, John P. Craver, Esq. [Docket No. 54] is **GRANTED IN PART** and **DENIED IN PART** as stated in this order.  It is further

**ORDERED** that Owners' Motion to Exclude Certain Opinions and Testimony of Plaintiff's Expert David Young [Docket No. 83] is **GRANTED IN PART** and **DENIED IN PART** as stated in this order.  It is further

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment on First Claim for Declaratory Relief [Docket No. 62] is **DENIED**.  It is further

**ORDERED** that Defendant Owners Insurance Company's Motion for Summary Judgment [Docket No. 63] is **GRANTED IN PART** and **DENIED IN PART**.  It is further

**ORDERED** that defendant's summary judgment motion is **GRANTED** as to plaintiff's first claim for relief.  It is further

**ORDERED** that defendant's summary judgment motion is **DENIED** as to plaintiff's second and third claims for relief.

DATED January 23, 2018.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge